SHELTON L. FREEMAN (AZ #009687)
**FREEMAN HUBER LAW PLLC**
6909 East Main Street
Scottsdale, Arizona 85251
Phone: (480) 398-3100
Fax: (480) 398-3101
E-mail: bkfilings@fhlawaz.com

*Attorneys for Clear Energy Systems, Inc.*

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | In Proceedings Under Chapter 11 |
| CLEAR ENERGY SYSTEMS, INC., | Case No.: 2:14-bk-12716-BKM |
| Debtor. | |

**FIRST AMENDED DISCLOSURE STATEMENT IN SUPPORT OF**

**PLAN OF REORGANIZATION**

**OF DEBTOR CLEAR ENERGY SYSTEMS, INC.**

**DATED JULY 7, 2015**

C:\Users\rmilazzo\Desktop\1st.Amended.DS.05.docx

# I. **INTRODUCTION**.

## A. **Purpose Of Disclosure Statement**.

CLEAR ENERGY SYSTEMS, INC. ("CES" or the "Debtor"), which is the debtor and debtor-in-possession in the above-captioned Chapter 11 case (the "Debtor"), is providing this First Amended Disclosure Statement (the "Disclosure Statement") to all of its known creditors and equity security holders, pursuant to 11 U.S.C. § 1125, in order to permit them to make an informed judgment in exercising their right to vote on the First Amended Plan of Reorganization of Debtor CLEAR ENERGY SYSTEMS, INC., dated July 7, 2015 (the "Plan"), as described below. All capitalized terms used, but not defined, in this Disclosure Statement have the meanings ascribed to such terms in the Plan, a copy of which is attached as **Exhibit A** to this Disclosure Statement and incorporated herein by reference.

## B. **Source Of Information**.

The information contained herein has been compiled from records of the Debtor and projections have been prepared by Debtor's board of directors and consultants.

## C. **Disclaimers**.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS PROVIDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN OF REORGANIZATION OF THE DEBTOR AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DECIDE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL HOLDERS OF CLAIMS OR INTERESTS IN THE DEBTOR ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED BY THE PLAN AND THE EXHIBITS ATTACHED TO THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT IN THE FUTURE. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

FREEMAN HUBER LAW PLLC
6909 East Main Street
Scottsdale, Arizona 85251

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE § 1125 AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY RAISED IN ANY CONTESTED MATTER, ADVERSARY PROCEEDING, OR OTHER ACTION, OR AS A STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATION. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTOR.

## II. <u>**OVERVIEW AND PRE-PETITION HISTORY OF THE DEBTOR**</u>.

The Debtor is headquartered in Tempe, Arizona (the "Premises"). Its business model is designing, updating and developing a radial engine based on the R-1820 engines that powered many US aircraft and helicopters from the 1930s to the 1950s. The new engine will be fueled by gasoline or gaseous fuel, such as methane, natural gas or propane. Adopting modern design practices and materials, the engine has the potential of developing 1500bhp with good durability at low cost from a modestly sized engine package. It has potential use across a plethora of military, industrial and commercial applications.

Debtor is a Nevada corporation formed on May 17, 2002. It registered to do business in Arizona on June 20, 2003. Since inception it has raised and spent approximately forty million dollars ($40,000,000.00) on engine development.

The engine has gone through three iterations during development. Originally, Debtor was formed to purchase intellectual property that would allow a WWII era engine to operate with water injection. Injecting water into the engine during combustion significantly increases the specific output for a given engine size, resulting in a smaller and lighter engine.

As the water injection concept was developed over the first four years, management decided that modifying WWII era engines would result in limited marketability compared with a complete engine redesign utilizing modern materials and engine design practice. A new CEO, Anthony Carmen, an experienced engineer whose business was overseeing the design and

FREEMAN HUBER LAW PLLC
6909 East Main Street
Scottsdale, Arizona 85251

C:\Users\rmilazzo\Desktop\1st.Amended.DS.05.docx

sourcing (typically in China) of automobile engine parts for the domestic auto industry, notably General Motors Corporation, was hired.

Mr. Carmen undertook the entire redesign of every part and component in the engine. It took about four years to create a new engine prototype. The goal of the engine is initially to power a mobile one megawatt (1MW) class "gen set" that will have the engine, ancillaries, electronic controls and electric generator within a mobile, sound-attenuated housing. The unit will be about fifteen (15) feet long and weigh about sixteen thousand (16,000) pounds. It can be pulled by a pick-up truck and navigated into tight spaces. Although there are competing gen sets made by major manufacturing concerns such as Cummins Engine and Caterpillar, CES estimates a competing system with options equal to those CES intends to offer as standard would require a tractor-trailer set up to make it mobile. The trailer would be about forty (40) feet long and weigh close to fifty thousand (50,000) pounds. A tractor would be needed to move it due to the weight.

The CES gen set would cost less and burn less fuel, so it would be cheaper to run – measured in the industry as fewer cents per kilowatt hour. It will also be much cheaper to maintain. A full overhaul of a Caterpillar gen set requires moving it to a Caterpillar dealership and can take as long as three (3) months. An overhaul of CES's gen set would mean pulling out the engine and rebuilding it on site within a day or two. A customer could rent a replacement engine from CES while its engine is overhauled and literally have no down time.

During the redesign of the engine, several companies sought distributorships for the pending gen sets. Distributorship agreements were signed for Canada, Mexico and New Zealand with an entity known as GASGen Canada and for a number of European countries with SARN Power LLC. Interest was expressed for distributorships in the Arab Countries and Asia.

About the time the new prototype was up and running, funding the completion of the design and implementation of production became problematic. It was estimated to take fourteen (14) months and another eight to ten million dollars ($8-10,000,000.00). CES' Eastern European distributor, SARN Power LLC and SARN Industrial LLC (collectively "SARN"), agreed to provide up to ten million dollars ($10,000,000.00) in financing in return for a controlling interest in the Debtor. An agreement was reached at the end of 2013 whereby SARN would incrementally inject cash into CES in segments of one million five hundred thousand dollars ($1,500,000.00) at a time. As part of the agreement SARN took control of the board effective January 2014.

In April 2014, after only three (3) months of management and one segment of capital infusion, SARN shut down CES without notice. All employees were terminated, the facilities were closed and assets were removed from the Premises. Despite the forty million dollars ($40,000,000.00) that had been invested in the development of the gen set, SARN walked away

and gave none of the other CES shareholders (the "Shareholders") notice of their abandonment of the project.

In light of the lack of communication, none of the Shareholders were aware of the abandonment and resulting defaults that occurred due to lack of payments to vendors, landlords and other suppliers. Once information was obtained regarding the shutdown of the operations, garnering information was difficult as SARN had possession and control of the business records of CES, precluding any effective analysis as to the ongoing obligations or pending defaults.

However, a number of individual Shareholders gathered to address their significant investment in CES and the impending risk of loss of the entire operation and decided to take action.

In conjunction with shutting down the business, SARN disposed of assets and ceased making payments to creditors. Various equipment lessors took possession of their equipment and the landlord issued a default under the lease for the Premises. The landlord later terminated the Debtor's right to possession to the Premises and eventually noticed a sale of the personal property located in the Premises to satisfy the amounts owing to it.

After closing down the business, the SARN representatives on the board of directors of CES refused to resign without obtaining a release from CES. In order to protect the remaining assets of CES, the SARN representatives on the board were provided with releases upon resigning. While SARN retained its stock in CES, the parties agreed that the SARN distributorship agreement would be cancelled. Debtor and its counsel are reviewing the transaction and conduct of SARN to determine the existence of any claims and enforceability of the release of the SARN representative board members.

The board of directors ("Board") was reconstituted after SARN's withdrawal and the Board determined that the only means to protect the tens of millions invested in the project was to file a bankruptcy petition to stay any further creditor actions and to raise funds in order to pay ongoing expenses while new investors are located to complete the final stages of development and production of the gen set.

Prior to the bankruptcy filing, one of the shareholders of CES made demand on the D&O policy maintained by CES. The filing of the bankruptcy petition stayed that from proceeding and the parties are currently negotiating relief from stay to allow that claim to proceed against the insurer.

On August 15, 2014 (the "Petition Date"), the Debtor sought the benefits of the Bankruptcy Code to protect its property and creditors and preserve the value of its business through a restructuring of its liabilities. The Debtor believes that its proposed Plan will offer

C:\Users\rmilazzo\Desktop\1st.Amended.DS.05.docx

the most meaningful opportunity for recovery for all creditors and parties in interest in this Chapter 11 Case.

## III.   **POST-PETITION ACTIVITIES AND OPERATIONS**.

### A.   **Business Operations**.

Since its Chapter 11 filing, the Debtor has regained access to the Premises and business records. While the primary focus of the Debtor has been to gather the information needed to solicit a new major investor or group of investors (collectively, the "Investor") and obtain current funding to maintain the Debtor pending its search, the Debtor is also exploring what happened to the various items that were disposed of by SARN, and the Debtor continues to explore the records for information regarding those items. To the extent Debtor establishes that any property was not properly handled by SARN, it may pursue claims for relief. The Debtor has also assembled the necessary consultants to gather all of the engineering and manufacturing information and financial analysis to present to potential new Investors to infuse sufficient capital that would enable the further development of the technology.

The Debtor has approved employment applications for the following professionals: Freeman Huber Law, PLLC, as general bankruptcy and restructuring counsel; Sarvas, Coleman, Edgell & Tobin, PC, as special accountants; Bejin Bienemen PLC, as special IP counsel; BDO USA, LLP, as ordinary course accountants for tax return preparation; and Paul A. Conant of Conant Law Firm, PLC, as special counsel to assist with independent contractor issues.

The Board sought funding for bankruptcy related expenses from the existing Shareholders as well as Debenture Holders and Bridge Lenders (defined below). Many of the Debenture Holders and Bridge Lenders are Shareholders of the Debtor. Given the risk that the post-petition funds would not be recovered if the Debtor is not successful in locating new investor(s) to fund the reorganization, a number of Shareholders agreed to provide post-petition unsecured credit to the Debtor to provide funds to pay post-petition expenses while a search is made for the additional capital needed to preserve the value developed over the past decade and millions invested to date. While the various opportunities to provide post-petition credit were made available to all Shareholders, Debenture Holders and Bridge Lenders, not all participated. Those that did participate (the "PPLs") have provided post-petition unsecured funding to the Debtor in the initial amount of one hundred thousand dollars ($100,000.00), the "First Tranche"; one hundred thousand dollars ($100,000.00) through a second round of unsecured financing, the "Second Tranche"; and four hundred thousand dollars ($400,000.00) through a third funding, the "Third Tranche". A "Fourth Tranche" is in process of being raised in the amount of $200,000.

The success of the project depends upon having the ability to demonstrate the gen set to potential Investors and show them the generator in operation. Currently, the Premises are set up to allow the operation of the generator due to significant improvements that were made

C:\Users\rmilazzo\Desktop\1st.Amended.DS.05.docx

when CES first moved into the Premises. These include an oversize natural gas line, water towers and other related equipment, all of which are essential to Debtor's ability to operate the generator. The cost to duplicate these critical elements at another location would exceed three hundred fifty thousand to four hundred thousand dollars ($350,000-$400,000.00).

Given the critical nature of continuing operation of the Debtor's business on the Premises, and the existence of a pre-petition default caused by SARN's departure without notice, the Debtor was required to seek turnover of possession of the Premises and provide adequate protection for the ongoing rent payments. After successfully regaining access to the Premises, Debtor was then faced with the need for an extension of the Premise's lease (the "Lease") that was set to expire on January 31, 2015. The Debtor and the landlord (the "Landlord") of the Premises agreed to extend the Lease by six months, which extended the Lease until July 31, 2015, subject to various conditions imposed by the Landlord. Given the requirements of the Landlord, the Debtor was required to seek additional unsecured credit via the Second and Third Tranches to fulfill the Lease extension requirements. Since the reorganization efforts have taken additional time, the Debtor has requested an additional extension of the Lease through and including January 31, 2016. The Landlord has agreed to provide the extension, subject to prepayment of rent ($62,874.00 for the extension period) and expected operating expenses of $21,383.16, along with certain other conditions. As part of the extension, one of the directors/shareholders of the Debtor, Mr. Jack Rasor, has agreed to individually use his personal funds to provide the Landlord with the security deposit in the amount of $112,889.00. The funds will remain the property of Mr. Rasor, subject to Landlord's rights and remedies to the security deposit and the Debtor will have no claim to those funds upon the release of some or all of them by the Landlord. In return, the Landlord will apply the existing security deposit to the new rent and expenses under the extended Lease and return the surplus funds to the Debtor for its use with the reorganization process. The Debtor is filing a motion to seek approval of the Lease extension concurrently with the filing of the Disclosure Statement.

Debtor has also engaged various prior employees familiar with the Debtor's operation as independent contractors to assist with the process of presenting the prototype and financial information to Investor(s) and to assist in the completion of the project.

**B.**     **Reorganization Approach**.

The Debtor undertook efforts to gather all relevant information to compile a package sufficient to present to potential Investors. Based upon the analysis performed, Debtor estimates that additional capital in the range of $12,000,000 to $18,000,000 will be needed to take the development of the prototype from its current status through the various stages of finalizing the design, constructing initial beta versions, and completing testing and manufacture of the units for the marketplace.

C:\Users\rmilazzo\Desktop\1st.Amended.DS.05.docx

FREEMAN HUBER LAW PLLC
6909 East Main Street
Scottsdale, Arizona 85251

The details of those steps, the costs involved and the timeframe for the infusion of funds are set out in **Exhibit B**, attached hereto.

While the Debtor has been having preliminary conversations with various potential investors and/or end users, the final materials to present to potential Investors have only recently been completed. Accordingly, efforts to formally interact with potential Investors have only recently begun. However, the most likely exit strategy is to find new Investor(s) that will infuse sufficient capital so that the development and production of the gen set can continue and implement a business strategy for the sale of the units.

Based upon the projections compiled by Debtor's consultants and reviewed by the Board, the successful implementation of the current technology into marketable gen sets could result in significant long-term operating profits. The projections, attached hereto as **Exhibit C**, demonstrate potential sales in North America of in excess of one hundred million dollars ($100,000,000.00) per year. The timeframe to reach this level spans several years to account for the remaining development, testing and marketing, so there is no immediate return; however, Debtor believes that there is a reasonable likelihood that these sales levels can be achieved and with time, sufficient funds can be recovered by the Debtor to satisfy its creditors in full and return funds to the Shareholders who have participated in the development of this product over the past thirteen (13) years.

In order to attract potential Investors, Debtor proposes to create a new entity that would act as reorganized debtor which will be initially proposed as a limited liability company ("RDLLC"). In return for the assignment by Debtor of its IP Technology, prototype and related business assets (excluding Causes of Action) to RDLLC, Debtor would receive a membership interest in RDLLC. The new Investor(s) would contribute their funds to RDLLC in return for a majority interest in RDLLC. The PPLs who provided the unsecured post-petition credit will be provided the opportunity to convert their post-petition claims into membership interests in RDLLC. The Debtor would continue in existence for purposes of receiving membership distributions from RDLLC and making payments to Debtor's creditors and potentially making distributions to its Shareholders.

The Debtor has also been in negotiations with its consultants to offer options to acquire an interest in RDLLC in return for their respective efforts in a successful transition to RDLLC.

Under the Plan, RDLLC will assume the obligations of the Arizona Commerce Authority (as detailed below), which holds a priority security interest in the IP Technology, and Debtor would be released from that obligation.

Distributions from RDLLC would be made pro-rata to the respective members. The funds distributed to Debtor would first be used to pay any current operating expenses, then any

FREEMAN HUBER LAW PLLC
6909 East Main Street
Scottsdale, Arizona 85251

unpaid post-petition expenses and, once those obligations are satisfied, the funds would then flow to Debtor's creditors until paid in full and then to the Shareholders.

As a result of the PPLs converting into equity in RDLLC and releasing CES of any obligations with respect to the post-petition unsecured credit, and the assumption of the Arizona Credit Authority obligation by RDLLC, significant obligations will be removed from the Debtor; therefore, the other creditors of the Debtor will receive the benefit of distributions to the Debtor from RDLLC more expeditiously. Based upon the sales projections in **Exhibit C**, the value to the Debtor's creditors and Shareholders could conservatively exceed $50,000,000.00 in approximately five years.

A recent market analysis performed for the Debtor reflects several applications for the Debtor's product. Those include supporting service companies, remote power generation and emergency power needs. These sectors are estimated to provide sales opportunities of 3,500 units annually, with longer term growth to continue thereafter.

Absent the successful reorganization of Debtor, other than a secured creditor potentially obtaining a partial recovery, all creditors and Shareholders will receive no recovery at all.

The Debtor will provide a proposed operating agreement for RDLLC as part of the negotiation with the potential Investor(s).

All Causes of Action owned by the Debtor and/or Estate will be retained by the Debtor. The Debtor proposes that the existing Board remain in place post-confirmation to be responsible for managing the Debtor post-confirmation and for pursuing certain of the Debtor's Causes of Action.

## IV.  **STATEMENT OF ASSETS AND LIABILITIES**.

The Debtor's primary assets are identified in its Schedules and Statement of Financial Affairs filed in the Bankruptcy Case on September 9, 2014, Docket No. 29:

(1) Intellectual property and technology (collectively the "IP Technology") consisting of certain patent rights and pending patent rights. The Debtor has retained professionals to evaluate the IP Technology and will be seeking to retain a valuation expert to value those rights. Based upon the current status of the Debtor and the IP Technology, the Debtor estimates that the IP Technology will have an as is value significantly less than the secured claim of Arizona Commerce Authority.

(2) Personal property consisting of various tool and dyes, generators and other shop equipment. The book value carried on Debtor's books and records reflects a total of $577,037.53. However, the vast majority of the items are either not in Debtor's possession, are

C:\Users\rmilazzo\Desktop\1st.Amended.DS.05.docx

obsolete or have little to no market value. Many of the items were contracted for but still remain with the manufacturers, in many instances in China. The cost to recover the items would likely exceed the value that could be obtained if the items were sold. The Debtor estimates that the current actual value of the personal property is estimated at approximately $65,000.00

(3) Debtor's interest, as Tenant, in property located at the Premises. Debtor has also posted a security deposit as required by the Landlord in the sum of $112,889.00.

The Debtor's largest secured creditor is Arizona Commerce Authority ("ACA"). As of the Petition Date, the Debtor owed ACA one million dollars ($1,000,000.00). ACA's claim is secured by the Debtor's IP Technology. Additionally, the Debtor has identified other secured creditors that may potentially hold secured claims. The Bank of New York Mellon is the representative of the Debenture Holders. The Debenture Holders were granted a blanket security interest in the assets of the Debtor; however, the security interest was subordinated to the lien of the ACA in the IP Technology. Accordingly, due to the minimal value of the personal property and the fact that the ACA has the priority lien on the IP Technology, it is unclear whether the Debenture Holders have any collateral value securing their claim. The Debtor believes that all other equipment lessors regained possession of their equipment and there are no additional secured claims beyond those described above.

Debtor has obtained post-petition unsecured credit from the PPLs totaling approximately six hundred thousand dollars ($600,000.00), and is presently obtaining an Fourth Tranche of an additional two hundred thousand dollars in funding and will likely be seeking additional funding prior to confirmation of the Plan.

As of the Petition Date, the Debtor has various unsecured creditors. The Debtor owes unsecured claims to a group referenced as Bridge Lenders in the amount of nine hundred two thousand five hundred dollars ($902,500.00) and, to the extent the Debenture Holders are unsecured, they hold a claim in the amount of two million seven hundred twenty thousand dollars ($2,720,000.00).

In addition, Debtor has scheduled various trade and other unsecured creditors of approximately $763,000. When combined with the Debenture Holders and Bridge Lenders, it results in total unsecured claims of approximately $4,385,500.

Debtor has two potential executory contracts. As described above, Debtor entered into two distributorship agreements with SARN and GasGen. While the Debtor believes the SARN agreement has been cancelled, it will evaluate the GasGen agreement in conjunction with the new Investor regarding whether to assume or reject the agreement.

## V.     DESCRIPTION OF THE PLAN.

FREEMAN HUBER LAW PLLC
6909 East Main Street
Scottsdale, Arizona 85251

The following is a summary of certain significant provisions of the Plan. This summary is qualified in its entirety by reference to the more detailed information set forth in the Plan. This Disclosure Statement, together with the Plan, which is attached hereto as **Exhibit A**, should be read completely. The Plan, if confirmed, will be binding upon the Debtor, its creditors and the holders of equity Interests.

## A. Administrative Claims and Priority Tax Claims.

As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not to be classified for purposes of voting on, or receiving distributions under, the Plan.

### 1. Treatment of Administrative Claims.

a. General Administrative Claims. The holder of an Allowed Administrative Claim will be paid, in full satisfaction of such Claim: (a) a single Cash payment in the Allowed amount of the Claim on the Effective Date; (b) payment in the ordinary course of business as said Claim matures; or (c) payment upon such other less favorable terms as may be agreed upon in writing by the holder of such Claim and the Debtor, or as ordered by the Bankruptcy Court.

b. Post-Petition Lenders. The PPLs that provided unsecured credit to the Debtor hold promissory notes that have various maturity dates and accrue interest at the rate of ten percent (10%) per month. The holders of each note will be paid as follows: (1) if the holder of a post-petition promissory note does not elect to convert to an equity interest in RDLLC, the maturity date of each note shall be modified to be upon the receipt by Debtor of distributions from RDLLC. The holders of such note(s) shall be paid from the distributions received by Debtor from RDLLC and shall be entitled to be paid in full with all accrued interest before distribution of said funds to any other pre-petition creditors of Debtor; or (2) the holders may elect to convert the note(s) into a membership interest in RDLLC. The amount of membership interest shall be allocated pro-rata for all holders of such notes in such amount as is negotiated with the new Investor in RDLLC. The effect of such election shall be a full satisfaction and release of Debtor from any payment obligation under such note(s) and the holders will have no further right to recover payment except in the form of distributions from RDLLC as a member.

### 2. Deadline for Filing Claims for Administrative Expenses.

With the exception of applications for compensation and reimbursement filed by the Debtor's Professionals, which applications shall be filed no later than sixty (60) days after the Effective Date, all requests for payment of Administrative Claims shall be filed by the *earlier* of:

C:\Users\rmilazzo\Desktop\1st.Amended.DS.05.docx

(i) thirty (30) days after the date of service of notice of the Effective Date, *or* (ii) any applicable Bar Date established by the Bankruptcy Court and noticed separately by the Debtor. If Administrative Claims are not timely filed in accordance with this Plan, they will be forever barred and will not be assertable in any manner against the Debtor or the Estate; *provided, however,* that no such request for payment shall be required with respect to Administrative Claims that have been paid previously or with respect to Administrative Claims for expenses incurred in the ordinary course of business, including without limitation the claims of the PPLs, unless a dispute exists as to any such expenses, or unless the provisions of the Bankruptcy Code require approval or allowance by the Bankruptcy Court as a precondition to payments being made on any such expense.

### 3.  Treatment of Priority Tax Claims.

Each holder of an Allowed Priority Tax Claim will be paid, consistent with § 1129(a)(9)(C) of the Bankruptcy Code and in full satisfaction of such holder's Priority Tax Claim: (i) the amount of such holder's Priority Tax Claim, with simple interest at the rate of six percent (6%) per annum (or such other rate as the Bankruptcy Court may determine at the Confirmation Hearing is appropriate), in deferred Cash payments over a period of six (6) years from the date of assessment, to be paid in equal quarterly installments of principal and interest from the Debtor, provided that: (a) the Debtor may prepay the balance of any such Priority Tax Claim at any time without penalty; and (b) the treatment of Priority Tax Claims shall not be less favorable than the most favored nonpriority unsecured claim provided for by the Plan; or (ii) such other treatment as may be agreed upon in writing by such holder and the Debtor, as appropriate or ordered by the Bankruptcy Court. The Debtor believes that there are no Priority Tax Claims.

### B.  Classification and Treatment of Claims and Interests.

For purposes of voting, distributions, and all confirmation matters, except as otherwise provided herein, all Allowed Claims and Interests shall be classified and treated as follows:

(a)  Class 1:  Priority Non-Tax Claims.  Each holder of a Priority Non-Tax Claim that is an Allowed Claim shall be unimpaired under the Plan and, pursuant to Section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights of each holder of a Priority Non-Tax Claim that is an Allowed Claim in respect of such Claim shall be fully reinstated and retained as though the Chapter 11 Case had not been filed. Holders of Allowed Priority Non-Tax Claims shall not be entitled to vote on the Plan and, instead, shall be deemed to have accepted the Plan. The Debtor does not believe that there are any holders of Class 1 Priority Non-Tax Claims and that this Class will, therefore, be deleted from the Plan.

C:\Users\rmilazzo\Desktop\1st.Amended.DS.05.docx

FREEMAN HUBER LAW PLLC
6909 East Main Street
Scottsdale, Arizona 85251

(b)    Class 2: Arizona Commerce Authority Claim.    This Class shall consist of the Secured Claim of ACA in the principal amount of one million dollars ($1,000,000.00), plus any accrued unpaid interest at the contract rate of three percent (3%), which is all secured by a first priority lien on the Debtor's IP Technology.  The Debtor believes that the aggregate value of the IP Technology is less than the amount of ACA's secured claim.  Except as otherwise provided in this Plan, ACA shall retain its lien on the IP Technology, unless the holder of the Class 2 ACA Claim agrees to a different treatment.

The obligations owing to ACA shall be assumed by RDLLC and shall be modified as follows: Pursuant to the Grant and Conditionally Forgivable Loan and Security Agreement ("Loan Agreement") between ACA and Debtor, the Loan: (i) has a maturity date of November 10, 2016; (ii) accrues interest at the rate of three percent (3%) per annum; and (iii) has incentive provisions that result in a potential forgiveness of the obligation in the event Debtor creates a certain number of jobs and maintains them.

Under the Plan, the terms of the Loan Agreement and all related documents would be modified as follows:

A.  The Maturity Date would be extended by two (2) years to November 10, 2018;

B.  The date from when the jobs must be maintained will be continued from January 1, 2015 to January 1, 2017; and

C.  Such other amendments as needed to confirm the assumption of all obligations by RDLLC, the assignment of the IP Technology from the Debtor to RDLLC, and the continued perfection of the ACA lien.

D.  Notwithstanding any valuation of the IP Technology that may be less than the full amount of the ACA Claim, the full amount of the ACA Claim shall be assumed by RDLLC and the claim shall be payable according to its terms, as modified herein.

Upon the assumption by RDLLC, ACA will release any claims against Debtor.

The Class 2 Claim is **impaired** under the Plan.

(c)    Class 3: Debenture Holders.  This Class shall consist of the Class 3 Claims of the debenture holders (the "Debenture Holder Claims") who are parties to the 12% Secured Convertible Debenture Agreement dated November 15, 2010 (the "Debenture"), in the amount of approximately two million seven hundred twenty thousand dollars ($2,720,000.00).  A list of the Debenture Holders is attached hereto as **Exhibit D**.  To the extent that the Debenture Holders hold any security for their claim, the secured portion of their claim will be paid as follows: Within sixty (60) days after the Effective Date, the Class 3 Claims shall receive either: (i) a cash payment for the actual

value of all or a portion of the collateral acquired by RDLLC; or (ii) access to take possession of the collateral along with an assignment from the Debtor of its interest in any items of personal property collateral that are not located at the Premises and/or in Debtor's possession, the transfer of which shall constitute full satisfaction of the Class 3 secured claim.

Pursuant to the terms of the Debenture, the obligations owing by the Debtor to the Debenture Holders are subordinated to the right of payment of Permitted Indebtedness (as defined therein). Permitted Indebtedness is defined in the Debenture as follows:

> "**1.1.64** **"Permitted Indebtedness"** means the principal amount of and the interest and premium, if any, on and fees and costs relating to: (i) Indebtedness of the Company (other than Indebtedness evidenced by the Debentures), whether outstanding on the date of this Indenture or hereafter created, incurred, assumed or guaranteed, for money borrowed by the Company (including, without limitation, by means of term loans, operating loans, working capital loans, acceptances, debt instruments and any liability evidenced by bonds, debentures, notes or similar instruments or pursuant to or otherwise resulting from foreign exchange, currency exchange, hedging, monetization, swaps and similar money management arrangements); and (ii) renewals, extensions or refundings of any Indebtedness referred to in (i) of this definition, unless in any case it is provided by the terms of the instrument creating or evidencing such Indebtedness or pursuant to which such Indebtedness is outstanding that such Indebtedness does not rank prior in right of payment to, or *pari passu* with, the Debentures but subordinate in right of payment to, the Debentures;"

Pursuant to this definition, the obligations owing to the Bridge Lenders in Class 4 constitute a Permitted Indebtedness; accordingly, pursuant to this subordination provision, the Debenture Holder Claims will not receive any distribution unless and until the Bridge Loan Holders are paid in full.

Based upon the fact that the Bridge Lender Claims must share pro-rata with the Debtor's other unsecured creditors, the Bridge Lender Claims will not be paid in full until all Class 5 Unsecured Claims are also paid in full. As a result, upon payment in full of the Class 4 and Class 5 Claims, all proceeds will then be applied toward the unsecured portion of the Class 3 Debenture Holder Claims until paid in full.

FREEMAN HUBER LAW PLLC
6909 East Main Street
Scottsdale, Arizona 85251

C:\Users\rmilazzo\Desktop\1st.Amended.DS.05.docx

FREEMAN HUBER LAW PLLC
6909 East Main Street
Scottsdale, Arizona 85251

The unsecured portion of the Debenture Holder's claim shall be paid after the payment in full of the Bridge Lender Claims from the distributions received by the Debtor from RDLLC, after payment in full of all higher priority claims. As a result of the Bridge Lenders receiving pro-rata payments with Class 5, the Debenture Holder claims will not receive distributions until the Bridge Lenders, and other unsecured creditors, receive payment in full. Interest will accrue on the unsecured portion of the Class 3 Claim until paid at the rate of 12% per annum pursuant to contract. There will be no penalties for prepayment of all or part of the Debenture Holder Class 3 Claim. The Class 3 Claim is **impaired** under the Plan.

(d) <u>Class 4: Bridge Lenders</u>. This Class shall consist of the unsecured claims of the bridge lenders in the amount of approximately nine hundred two thousand five hundred dollars ($902,500.00). A list of the Bridge Lenders is attached as **Exhibit E**. The Class 4 Bridge Lender claims are unsecured; however, pursuant to the subordination provision in the Debenture referenced above, are entitled to payment priority over the Debenture Holders. Accordingly, the Class 4 Bridge Lender Claims will be paid pro-rata with the unsecured creditors of the Debtor in Class 5 from the distributions received by the Debtor from RDLLC, after payment in full of all higher priority claims. Interest will accrue on the Class 4 Claim until paid at the contract rate in the respective Bridge Loans (ranging from 14% - 20 % per annum). The Class 4 Claim is **impaired**.

(e) <u>Class 5: Unsecured Creditors</u>. The Class 5 General Unsecured Claims consist of every Unsecured Claim against the Debtor which is not an Administrative Claim, a Priority Non-Tax Claim, a Priority Tax Claim, a Debenture Claim or a Bridge Lender Claim. Interest will accrue on the General Unsecured Claims until paid at the rate of 5% per annum. Holders of Allowed Unsecured Claims shall be paid pro-rata with the Bridge Lender Claims in Class 4 from the distributions received by the Debtor from RDLLC, after payment in full of all higher priority claims. The Class 5 General Unsecured Claims are **impaired** under the Plan.

(f) <u>Class 6: Interests</u>. Class 6 Interests are the respective Shareholders of the Debtor. The holders of Class 6 Interests will retain their respective ownership interest in the Debtor based on the percentage of ownership held pre-petition, but only in the event all classes of creditor claims are paid in full. The Interests which comprise the Class 6 Interests are **impaired** under the Plan.

## C. <u>Means of Execution</u>.

The Plan will be implemented upon entry of an Order by the Bankruptcy Court confirming the Plan. Upon the Effective Date, or at such other time thereafter as specifically provided for in the Plan, Creditors holding Allowed Claims will receive the treatment provided for in the Plan. Creditors must hold Allowed Claims before they will be entitled to the

treatment provided in the Plan. The Plan will be funded from the distributions received by the Debtor as a member of RDLLC.

### 1. **Board of Directors and Officers.**

The board of directors of the post-confirmation Debtor shall be comprised of the existing Board. The identities, affiliations and the amount of compensation of the initial board members and initial officers as of the Effective Date are included on **Exhibit F** attached hereto. The selection of the persons who will serve as the initial directors, officers and managers of RDLLC as of the Effective Date shall be deemed to have occurred and be effective on and after the Effective Date without any requirement of further action by the Board. Any successors to the Debtor's Board will be appointed in compliance with the applicable Debtor's bylaws, articles of incorporation or other applicable corporate formation and governance documents. In the event that the members of the Board of the Debtor cannot come to a unanimous agreement on matters requiring Board approval, the Bankruptcy Court shall resolve any such dispute.

### 2. **Debtor's Assets and Causes of Action**.

The Debtor's and Estate's Interest in the assets of the Debtor, excluding Causes of Action and any personal property not purchased by RDLLC, shall be transferred to RDLLC free and clear of all liens, rights, claims, contracts or restrictions with the sole exception of the ACA lien, on the Effective Date in return for a membership interest in RDLLC. Causes of Action will be retained in the Debtor and prosecuted for the benefit of the creditors and equity holders of Debtor. Any personal property that is the collateral of Class 3 and not purchased by RDLLC shall be relinquished to Class 3 in full satisfaction of its secured claim.

### 3. **Powers of Officers.**

The officers of the Debtor or RDLLC, as the case may be, shall have the power to enter into or execute, deliver, file or record any documents or agreements that are deemed reasonable and appropriate to effectuate the terms of the Plan by the Board, without the necessity of any further Bankruptcy Court or Shareholder approval or action.

### 4. **Post-Confirmation Management and Ownership of RDLLC.**

RDLLC will be owned by the new Investor, Debtor and holders of PPL claims that converted into membership interests. Management of RDLLC will be determined by the members.

### D. **Additional Assurances.**

C:\Users\rmilazzo\Desktop\1st.Amended.DS.05.docx

The Debtor and any party-in-interest holding Claims herein will execute such other documents as are necessary to implement any of the provisions of the Plan.

**E. Conditions to Effectiveness of Plan.**

**1. Conditions to Effectiveness.**

The following are conditions precedent to the effectiveness of the Plan:

(a) The Confirmation Date has occurred, and the Confirmation Order is acceptable in form and substance to the Debtor and RDLLC;

(b) The Confirmation Order is a Final Order, *except that* the Debtor reserves the right to cause the Effective Date to occur notwithstanding the pendency of an appeal of the Confirmation Order, under circumstances that would moot such appeal; and

(c) No request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code has been made, or, if made, remains pending.

**2. Waiver of Conditions.**

The conditions to Confirmation and the Effective Date may be waived in whole or in part by the Debtor at any time upon written notice to the Bankruptcy Court, an order of the Bankruptcy Court, or any further action other than proceeding to Confirmation and consummation of the Plan.

**F. Liquidation Analysis / Cash Requirements.**

The proposed Plan provides for payment in full for allowed secured creditor claims and potentially full payment to the other unsecured classes as well as distributions to Shareholders.

Pursuant to section 1129(a)(7) of the Bankruptcy Code, for the Plan to be confirmed it must provide that creditors and holders of equity interests will receive at least as much under the Plan as they would receive in a liquidation of the Debtor under Chapter 7 of the Bankruptcy Code (the "Best Interest Test"). A Liquidation Analysis is attached as **Exhibit G** with a detailed analysis of the estimated recoveries and expenses for a Chapter 7 liquidation.

The Best Interest Test with respect to each impaired class requires that each holder of a claim or equity interest of such class either (a) accepts the Plan or (b) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtor had liquidated under Chapter 7 of the Bankruptcy Code. The Bankruptcy Court will determine whether the value received under the Plan by the holders

of claims in each class equals or exceeds the value that would be allocated to such holders in liquidation under Chapter 7. The Debtor has ensured that the Plan meets the Best Interest Test by providing for payment of Claims over time from distributions of RDLLC, and by providing for the pursuit of Causes of Action to provide additional value to the Estate. Thus, the Plan provides value that is not less than the value that would be recovered by each holder in a proceeding under chapter 7 of the Bankruptcy Code.

Counsel for the Debtor has incurred approximately one hundred twelve thousand three hundred sixty-four dollars ($112,364.00) in fees for professional services rendered to the Debtor and costs incurred through February 28, 2015. With respect to administrative claims, in light of potential disputes related to confirmation, as well as the pending and anticipated litigation, it is difficult to estimate the additional potential administrative costs to bring this matter to confirmation.

Payment of these amounts, fees due to the United States Trustee and Allowed Claims of Creditors are included in the projections attached to this Disclosure Statement as **Exhibit B.**

### G. Tax Consequences.

Substantial uncertainties exist with respect to any tax consequences of the Plan to any particular holder of a Claim or Interest. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan. Therefore, each holder is strongly urged to consult his, her, or its own tax adviser regarding the United States federal, state, and local and any foreign tax consequences of the transactions described in the Plan. No representations are being made regarding the particular tax consequences of the Confirmation and consummation of the Plan to Debtor or any holder of Claims or Interests.

In accordance with IRS Circular 230, holders of Claims or Interests are hereby notified that (i) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or Interests for the purpose of avoiding penalties that may be imposed on them under the IRS; (ii) any tax discussion contained in this Disclosure Statement is prepared in connection with the promotion of the transactions or matters discussed herein; and (iii) holders of Claims or Interests should seek advice based on their particular circumstances from an independent tax adviser.

Certain payments by the Debtor may be subject to information reporting to the Internal Revenue Service. Moreover, such reportable payments are subject to backup withholding under certain circumstances. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's United States federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

C:\Users\rmilazzo\Desktop\1st.Amended.DS.05.docx

**H. Alternatives to the Plan.**

If the Plan is not confirmed, several different events could occur: (1) a creditor or other party in interest could propose another plan providing different treatment of Claims and Interests; (2) the holder of the ACA Claim could move for relief from the automatic stay to allow it to foreclose its liens against the Debtor's IP Technology, which may be granted by the Court if a plan is not confirmed in a reasonable period of time; and/or (3) the Court, after appropriate notice and hearing, could dismiss the Case or convert the Case to a liquidation case under Chapter 7 if a plan is not confirmed in a reasonable period of time. Notwithstanding anything to the contrary contained herein, the Debtor shall not be bound by estoppel, or the principles of *res judicata* or collateral estoppel, with respect to any term or provision contained herein in the event the Plan is not confirmed upon the terms and provisions set forth herein.

**VI. VOTING.**

Creditors will receive a Ballot with the approved Disclosure Statement and Plan, on which to vote to accept or reject the Plan. Instructions for completing and returning the Ballot are set forth on the Ballot and should be reviewed carefully and followed. YOUR VOTE IS IMPORTANT. If you do not vote on the Plan, the wishes of other Creditors or interested parties may govern the treatment of your Claims or Interests. The Debtor therefore highly recommends that you participate in the voting process by timely providing your Ballot accepting or rejecting the Plan as in the Ballot accompanying this Disclosure Statement.

At a hearing scheduled by the Bankruptcy Court, the Court will consider whether the Plan meets the requirements of Bankruptcy Code § 1129 and, therefore, should be confirmed. THE PLAN CANNOT BE CONFIRMED IF THE PLAN DOES NOT RECEIVE AT LEAST TWO-THIRDS (2/3) IN AMOUNT AND MORE THAN ONE-HALF (½) IN NUMBER OF ALLOWED CLAIMS VOTING IN EACH IMPAIRED CLASS, provided, however, if the requisite acceptances are not obtained from one or more Impaired Classes, the Court may nonetheless confirm the Plan pursuant to 11 U.S.C. § 1129(b) if one Impaired Class accepts the Plan and the Court finds that the Debtor's Plan provides, among other things, fair and equitable treatment of the Classes rejecting the Plan and that creditors receive as much or more under the Plan than they would receive in a Chapter 7 liquidation.

**VII. CONFIRMATION.**

**A. Confirmation by Non-Acceptance Method.**

The Debtor hereby requests, if necessary, confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code with respect to any impaired Class of Claims that does not vote to accept the Plan.

FREEMAN HUBER LAW PLLC
6909 East Main Street
Scottsdale, Arizona 85251

FREEMAN HUBER LAW PLLC
6909 East Main Street
Scottsdale, Arizona 85251

**B.** <u>**Binding Effect Of Plan**</u>.

When confirmed, the provisions of the Plan shall bind the Debtor and any person or entity holding a Claim against the Debtor and its Estate, whether asserted or non-asserted, and any person asserting an interest in the Debtor, whether or not a Claim or Interest of such person or entity arose before or after the Petition Date or the Effective Date, whether or not the Claim or Interest is impaired under the Plan, and whether or not such person or entity has accepted the Plan.

**C.** <u>**Effect Of Confirmation**</u>.

Except as otherwise provided herein, the rights afforded in the Plan shall be in exchange for and in complete satisfaction, discharge and release of all claims against the Debtor of any nature whatsoever. All such claims against the Debtor shall be satisfied, discharged and released in full. All holders of claims against the Debtor shall be precluded from asserting against the Debtor, its Estate, or the assets or properties of the Debtor or its Estate any other or further claim based upon any omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date. This discharge shall be effective as to each claim, regardless of whether the claim is listed on the Debtor's Schedules filed in these Chapter 11 proceedings, whether a proof of claim was filed, whether such proof of claim was withdrawn, whether the claim is an Allowed Claim, in whole or in part, or whether the holder of the claim votes to accept or reject the Plan. Upon the Effective Date, all the property of the Debtor except the Causes of Action will vest in RDLLC, which, subject to the obligations set forth in the Plan, may utilize the property free of any burdens of the Bankruptcy Code and without need to obtain Court approval of its actions.

**D.** <u>**Modification Of Plan**</u>.

The Plan may be modified in accordance with the provisions of the Bankruptcy Code and Chapter 11 as follows:

    1. <u>**Pre-Confirmation**</u>.

In accordance with Section 1127(a) of the Bankruptcy Code, the modification of the Plan may be proposed in writing by the Proponent at any time before its Confirmation, provided that the Plan, as thus modified, meets the requirements of Sections 1122 and 1123 of the Code, and the Debtor complies with Section 1125 of the Code.

    2. <u>**Post-Confirmation**</u>.

In accordance with Section 1127(b) of the Bankruptcy Code, the Plan also may be modified at any time after its Confirmation and before its substantial consummation, provided that the Plan as thus modified meets the requirements of Sections 1122 and 1123 of the Code, provided further that the circumstances then existing justify such modification, and the Court

confirms the Plan as thus modified under Section 1129 of the Code.

### 3. **Objections.**

Any holder of a Claim or Interest that has accepted or rejected the Plan will be deemed to have accepted or rejected, as the case may be, the Plan as modified unless, within the time fixed by the Bankruptcy Court for doing so, such holder changes its previous acceptance or rejection.

### 4. **Effect.**

Every modification of the Plan will supersede the previous version of the Plan as and whenever each modification is effective. When superseded, the previous version of the Plan will be in the nature of a withdrawn or rejected settlement proposal and will be null, void and unusable by the Debtor or any other party for any purposes whatsoever with respect to any of the contents of such version of the Plan.

## E. **Withdrawal of Plan**.

The Plan may be withdrawn or revoked by the Debtor at any time before entry of the Confirmation Order.

## VIII. **RETENTION OF JURISDICTION.**

Notwithstanding Confirmation of the Plan, the Bankruptcy Court shall retain jurisdiction for all matters arising out of, or related to, the Chapter 11 Case and the Plan, including, but not limited to, all of the following:

## A. **In General.**

The Court shall retain jurisdiction to determine the allowance and payment of any Claims upon any objection thereto (or other appropriate proceedings) by the Debtor or RDLLC, or by any other party in interest entitled to proceed in that manner. As part of such retained jurisdiction, the Court shall continue to determine the allowance of Administrative Claims and any request(s) for payment(s) thereof, including Chapter 11 Professional Fees and costs which are Administrative Claims.

## B. **Sales.**

The Court shall retain jurisdiction to adjudicate and determine any issues that arise out of or relate to a sale of any Assets of the Debtor.

## C. **Financing**.

FREEMAN HUBER LAW PLLC
6909 East Main Street
Scottsdale, Arizona 85251

The Court shall retain jurisdiction to adjudicate and determine any issues that arise out of or relate to any and all motions made pursuant to § 363 of the Bankruptcy Code.

### D. Plan Disputes.

The Court shall retain jurisdiction to determine any disputes, which may arise regarding the interpretation of any provisions of the Plan.

### E. Further Orders.

The Court shall retain jurisdiction to facilitate the consummation of the Plan by entering, consistent with the provisions of the Plan, any further necessary or appropriate order(s) regarding the enforcement of the Plan and any provision(s) thereof.

### F. Other Claims.

The Court shall retain jurisdiction to adjudicate any causes of action or other proceedings presently pending or otherwise referenced here or elsewhere in the Plan, including, but not limited to any action regarding the initiation, prosecution, enforcement, compromise or settlement of the Causes of Action in the Debtor's Estate, and the adjudication of any and all "core proceedings" under 28 U.S.C. §157(b) which may be pertinent to the Chapter 11 Case.

### G. Enforcement of Plan.

The Court shall retain jurisdiction to enforce any provisions of the Plan and any and all documents relating to the Plan, including, but not limited to, the conduct of sales pursuant to 11 U.S.C. §§ 363(f) or (h) and the approval of any borrowing by the Debtor, if required by any lender.

### H. Appeals.

In the event of any appeal of the Confirmation Order, and provided that no stay of the effectiveness of such Confirmation Order has been entered, the Court shall retain jurisdiction to implement and enforce the Confirmation Order and the Plan according to their terms, including, but not limited to, jurisdiction to enter such orders regarding disbursements under the Plan or the consummation thereof as may be necessary to effectuate the terms of the Plan.

### I. Tax Issues.

The Court shall retain jurisdiction to adjudicate and determine any issues that relate to this Chapter 11 Case and any governmental unit's claim with respect to any tax or any fine, interest or penalty relating to a tax.

### J. Unexpired Leases and Other Executory Contracts.

FREEMAN HUBER LAW PLLC
6909 East Main Street
Scottsdale, Arizona 85251

The Court shall retain jurisdiction to determine any and all Claims arising from rejection of unexpired leases and other Executory Contracts.

**K.      Settlement Agreement Disputes.**

The Court will retain jurisdiction to determine any dispute which may arise regarding the enforcement of any settlement or compromise related to the Debtor's Chapter 11 Case.

**L.      Professional Fees and Costs.**

The Court will retain jurisdiction to determine any and all issues that relate to the payment of Debtor's Professionals in the Debtor's Chapter 11 Case.  Any professional fees incurred by the Debtor's Professionals after the Confirmation Date shall be payable in the ordinary course of the Debtor's and RDLLC's business without the need to seek or obtain Bankruptcy Court approval.

**M.      Closing of Case.**

This Chapter 11 Case shall be deemed closed upon entry of a final decree closing the case.

**IX.      CLAIMS ADJUDICATION AND DISTRIBUTION.**

**A.      Preservation of Debtor's Claims, Demands, and Causes of Action.**

In accordance with Bankruptcy Code Section 1123(b)(3), all of the Debtor's claims and causes of action will survive the entry of the Confirmation Order and the Effective Date; they will not be discharged by the Plan; and they will become and remain assets of the Debtor after the Effective Date.

**B.      Procedure for Determination of Claims.**

**1.      Objections to Claims.**

Except as to any Claim that has been Allowed prior to the Effective Date, no later than the last Business Day prior to the Effective Date, the Debtor or any party in interest may object to the allowance of any Claim against the Debtor or seek estimation thereof on any Claim (including any Claim amounts stated in the Plan).

**2.      Disputed Claims.**

No payments or other distributions will be made to holders of Claims unless and until such Claims are Allowed Claims pursuant to a Final Order.  If a Claim is not an Allowed Claim by or on the Effective Date or when payment is otherwise due under the Plan, payment of the

Freeman Huber Law PLLC
6909 East Main Street
Scottsdale, Arizona  85251

Allowed Claim will be made when a Claim becomes an Allowed Claim after the Effective Date or as otherwise specifically provided in the Plan.

### 3. Treatment of Contingent Claims.

Until such time as a contingent Claim or a contingent portion of an Allowed Claim becomes fixed or absolute or is Disallowed, such Claim will be treated as a Disputed Claim for all purposes related to distributions under the Plan. The holder of a contingent Claim will only be entitled to a distribution under the Plan when and if such contingent Claim becomes an Allowed Claim.

### 4. Administrative Claims Bar Date.

Administrative expense proofs of claim requesting payment of administrative costs and expenses incurred prior to the Effective Date pursuant to Sections 507(a)(1) and 503(b) of the Bankruptcy Code (except for Debtor's Professionals employed pursuant to Section 327 of the Bankruptcy Code) must be served and filed with the Bankruptcy Court no later than thirty (30) days after the Effective Date; provided, however, that proofs of claim will not be required with respect to any unpaid post-petition operating expenses incurred in the normal course of the Debtor's business prior to the Effective Date. Any such Claim that is not served and filed within this time period will be forever barred. Any Claims for fees, costs, and expenses incurred by any Debtor's Professionals after the Confirmation Date will be paid in the ordinary course.

### C. Distributions.

### 1. Delivery of Distributions.

Subject to Bankruptcy Rule 9010, distributions and deliveries to each holder of an Allowed Claim will be made at the address of such holder as set forth on the respective Proof of Claim (or at the last known address of such holder if no Proof of Claim is filed or if the Debtor has been notified of a change of address) as of the last Business Day prior to the Effective Date. If any holder's distribution is returned as undeliverable, no further distribution to such holder will be made unless and until the Debtor is notified of such holder's then current address, at which time all missed distributions will be made to such holder without interest. The Debtor will be under no obligation to attempt to locate the holder of any Allowed Claim or to recognize any purported transfer or encumbrance on the rights of holders of Allowed Claims after the Confirmation Date. Amounts of undeliverable distributions attempted by the Debtor will be retained by the Debtor until such distributions are claimed or become unclaimed property. All Claims for undeliverable distributions will be made on or before sixty (60) days following the third anniversary of the Effective Date. After such date, all unclaimed property will revert to the Debtor for additional distributions.

### 2. Means and Timing of Payment.

FREEMAN HUBER LAW PLLC
6909 East Main Street
Scottsdale, Arizona 85251

C:\Users\rmilazzo\Desktop\1st.Amended.DS.05.docx

Payments made to holders of Allowed Claims pursuant to the Plan will be in United States dollars by checks drawn on the domestic bank selected by the Debtor, or by wire transfer from a domestic bank, at the option of the Debtor. If any payment date falls due on any day that is not a Business Day, then such due date will be extended to the next Business Day.

### 3. **Prohibition Against Prepayment Penalties**.

If the Debtor so chooses, in its sole and absolute discretion, to prepay any obligation on which deferred payments are provided for under the Plan, the Debtor will not be liable or subject to the assessment of any prepayment penalty thereon unless otherwise ordered by the Bankruptcy Court.

### 4. **Fractional Dollars**.

Notwithstanding any other provision of the Plan, no payments or distributions under the Plan of or on account of fractions of dollars will be made. When any payment or distribution of or on account of a fraction of a dollar to any holder of an Allowed Claim would otherwise be required, the actual payment or distribution made will reflect a rounding up of such fraction to the nearest whole number.

### 5. **De Minimis Cash Distributions.**

No Cash payment of less than ten dollars ($10.00) will be made to any holder of an Allowed Claim unless a request for such payment is made in writing to the Debtor.

## X. **GENERAL PROVISIONS**

### A. **Notices**.

Any notice required or permitted to be provided under the Plan will be in writing and served by regular postage prepaid first-class mail, hand-delivery, facsimile, or e-mail.

### B. **General Injunction**.

Except as otherwise expressly provided in the Plan, the Confirmation Order shall provide, among other things, that all parties-in-interest who have held, hold, or may hold Claims are permanently enjoined on and after the Effective Date from: (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim against the Debtor, RDLLC or any successor-in-interest of the Debtor, against property of the Debtor, or against property of any successor-in-interest of the Debtor or RDLLC; (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtor, RDLLC or any successor-in-interest of the Debtor, property of the Debtor, or against property of any successor-in-interest of the Debtor or RDLLC with respect to any such Claim; (c) creating, perfecting, or enforcing any encumbrance of any kind

Debtor, or against property of any successor-in-interest of the Debtor or RDLLC with respect
to any such Claim; (d) asserting any setoff, right of subrogation, or recoupment of any kind
against any obligation due the Debtor, RDLLC or any successor-in-interest of the Debtor or
RDLLC, against property of the Debtor or RDLLC, or against property of any successor-in-
interest of the Debtor or RDLLC, with respect to any such Claim; (e) conducting any form of
discovery from the Debtor or RDLLC with respect to any such Claim, or any successor-in-
interest of the Debtor or RDLLC; (f) harassing the Debtor, RDLLC or any successor-in-
interest of the Debtor; and/or (g) asserting any claim for or assessing any form of penalty,
excise tax, and/or late fee on the Debtor or RDLLC with respect to such Claim as long as the
Debtor is in compliance with the terms of the Plan as they relate to such Claim. Nothing in
this paragraph is intended to preclude any person or entity who is sued by the Debtor or
RDLLC from asserting any defenses, including, without limitation, any setoff, right of
subrogation, or recoupment of any kind.

## C. **Interest**.

Whenever interest is to be computed under the Plan, interest will be simple interest and
not compounded. Unless otherwise specifically provided for in the Plan or the Confirmation
Order, post-petition interest shall not accrue or be paid on Claims, and no holder of a Claim
will be entitled to interest accruing on or after the applicable Petition Date on any Claim.

## D. **Vesting**.

As of the Effective Date of the Plan, all of the assets of the Estate excluding Causes of
Action and any personal property subject to the lien of the Class 3 Debenture Holders that is
not acquired by RDLLC, shall be transferred to RDLLC. All assets transferred to RDLLC shall
be free and clear of all liens, claims, and interest of creditors and parties-in-interest, except as
specifically provided in the Plan.

## E. **Successors and Assigns**.

The rights and obligations of any Creditor or other party-in-interest referred to in the
Plan will be binding upon, and will inure to the benefit of, the successors, assigns, heirs,
devisees, executors, and personal representatives of such Creditor or party-in-interest.

## F. **Severability and Reformation**.

It is the intention of Debtor to comply fully with the Bankruptcy Code and applicable
non-bankruptcy law in proposing the Plan. Therefore, if any provision of the Plan is
determined by the Bankruptcy Court to be contrary to the Bankruptcy Code or applicable non-
bankruptcy law, that provision will be deemed severed and automatically deleted from the Plan,
if it cannot be reformed or the provision or its interpretation will be deemed reformed to ensure
compliance; provided, however, that nothing contained in this paragraph will prevent the

FREEMAN HUBER LAW PLLC
6909 East Main Street
Scottsdale, Arizona 85251

Debtor from modifying the Plan in any manner whatsoever in accordance with and as set forth in the Plan. Pursuant to any ruling by the Bankruptcy Court regarding the subject matter of this paragraph, any such severance or reformation will be stated specifically in the Confirmation Order, which then will control notwithstanding any contrary or inconsistent provisions of the Plan.

### G.     <u>Payment of Statutory Fees and Filing of Quarterly Reports</u>.

All fees payable pursuant to 28 U.S.C. § 1980, as determined by the Bankruptcy Court at or in conjunction with the Confirmation Hearing, will be paid on or before the Effective Date and, thereafter, in accordance with applicable bankruptcy law. All quarterly reports of disbursements required to be filed by applicable bankruptcy law will be filed in accordance with applicable bankruptcy law.

### H.     <u>Governing Law</u>.

Except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under the Plan shall be governed by, construed, and enforced in accordance with, and subject to, the laws of the State of Arizona, excluding any laws that result in the application of the laws of another jurisdiction.

### I.     <u>Special Tax Issues</u>.

The issuance, transfer, or exchange of a security as defined under the Bankruptcy Code or applicable law, or the making or delivery of any instrument of transfer under the Plan, shall not be taxed under any state or local law imposing a stamp tax or similar tax as provided in Section 1146 of the Bankruptcy Code.

### J.     <u>Conflicts between Plan and Confirmation Order</u>.

In the event the terms of the Plan and the Confirmation Order conflict, the terms of the Confirmation Order shall govern.

### XI.     <u>RECOMMENDATION OF DEBTOR</u>.

The Debtor believes that the Plan provides the best available alternative for maximizing the recoveries that Creditors and Shareholders will receive from Debtor's assets. Therefore, the Debtor recommends that all creditors and Interest holders who are entitled to vote on the Plan vote to accept the Plan.

[SIGNATURE PAGE FOLLOWS]

C:\Users\rmilazzo\Desktop\1st.Amended.DS.05.docx

FREEMAN HUBER LAW PLLC
6909 East Main Street
Scottsdale, Arizona 85251

1   DATED this 7th day of July, 2015.

2                        CLEAR ENERGY SYSTEMS, INC.,
3                         a Nevada corporation

4                        By  /s/ Daniel McCauley
5                            Daniel McCauley
                             Its Chairman of the Board

6

7

8                        **FREEMAN HUBER LAW PLLC**

9                        By  /s/ Shelton L. Freeman
10                            Shelton L. Freeman
                             Attorney for Clear Energy Systems, Inc.

11

12   ORIGINAL filed via the CM/ECF
     Electronic Notification System and served to
13   all parties that have requested ECF
     notification in the Bankruptcy Case.

14
     COPIES of the foregoing served the 7th day
15   of July, 2015 via email on all requisite parties
     in accordance with Bankruptcy Rule 2002.

16
     By: /s/ Rachel H. Milazzo
17

18

19

20

21

22

23

24

25

26

C:\Users\rmilazzo\Desktop\1st.Amended.DS.05.docx

# **LIST OF EXHIBITS**

A. Plan of Reorganization

B. Production Costs and Funding Timeline

C. Projected Sales in North America

D. List of Debenture Holders

E. List of Bridge Lenders

F. Board of Directors

G. Liquidation Analysis