**SCHIAN WALKER, P.L.C.**
1850 NORTH CENTRAL AVENUE, #900
PHOENIX, ARIZONA 85004-4531
TELEPHONE: (602) 277-1501
FACSIMILE: (602) 297-9633
E-MAIL: ecfdocket@swazlaw.com
DALE C. SCHIAN, #010445
Attorneys for TEC International LLC

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | No. 2:14-bk-12716-BKM |
| CLEAR ENERGY SYSTEMS, INC., | CHAPTER 11 |
| Debtor. | **CREDITOR TEC INTERNATIONAL LLC'S MOTION FOR THE APPOINTMENT OF A TRUSTEE OR, IN THE ALTERNATIVE, CONVERSION TO CHAPTER 7** |

Creditor TEC International LLC ("**TEC**") submits its *Motion for the Appointment of a Trustee or, in the Alternative, Conversion to Chapter 7* (the "**Motion**"). As set forth in the Memorandum of Points and Authorities, cause exists, pursuant to Bankruptcy Code § 1104(a),[1] for the appointment of a trustee or, in the alternative, to convert this case to a proceeding until Chapter 7 pursuant to § 1112(b). Wherefore, TEC respectfully request that the Court appoint a trustee to administer these proceedings or, in the alternative, convert these proceedings to a case under Chapter 7.

DATED this __27th__ day of October, 2015.

                                              SCHIAN WALKER, P.L.C.

                                              By /s/  DALE C. SCHIAN, #010445
                                                   Dale C. Schian
                                                   Attorneys for TEC International LLC

---

[1] All future references are to Title 11 of the United States Code unless otherwise noted.

# MEMORANDUM OF POINTS AND AUTHORITIES

In support of its Motion, TEC states as follows:

A. **Factual Background**.

1. The Debtor filed its Chapter 11 petition on August 15, 2014 [DE 1]. As such, its exclusive right to file a plan, absent extension, would have expired on December 15, 2014, and its deadline to obtain acceptances of that plan on February 11, 2015.

2. At the initial status hearing held on October 16, 2014, the Debtor informed the Court that it would be seeking an extension of its exclusive right to file and solicit acceptances of a plan [DE 54].

3. On November 3, 2014, the *Debtor's Motion to Extend Plan Exclusivity Periods* was filed (the "**First Motion**") [DE 57].

4. The First Motion, among other things, detailed the Debtor's transactions with SARN Energy and SARN's Energy's decision to close the Debtor and walk away without notice. *See* First Motion at 3-4; *see also* Debtor's *First Amended Disclosure Statement in Support of Plan of Reorganization of Debtor Clear Energy Systems, Inc. Dated July 7, 2015* (the "**Amended Disclosure Statement**") [DE 174] at 4-5; TEC's *Objection to Debtor's First Amended Disclosure Statement and Proposed Chapter 11 Plan* at 3-4 [DE 199].

5. The First Motion stated:

> The Debtor is confident it will be able to manage its post-petition obligations through the funds obtained, while marketing the prototype to new investors and formulating a plan. The requested extension will – provide the Debtor the opportunity to *evaluate potential restructuring strategies, including potentially receiving financing from new investors and evaluating potential sale opportunities*.

First Motion at 4-5, ¶ 14 (November 2014) (italics added).

6. The First Motion continued, "[t]he Debtor is making good faith progress in developing a strategy to maximize the Debtor's assets for the benefit of its creditors." *Id.* at 5:15-17.

7. On December 17, 2014, the First Motion was granted [DE 94].

///

8. On January 13, 2014, the Court held a status hearing at which the Debtor indicated that it would file its plan of reorganization by April 13, 2015 [DE 99].

9. On April 13, 2015, the Debtor filed its *Chapter 11 Plan of Reorganization of Debtor Clear Energy Systems, Inc. dated April 13, 2015* [DE 124] and *Disclosure Statement in Support of Plan of Reorganization of Debtor Clear Energy Systems, Inc. Dated April 13, 2015* [DE 125]. No hearing was ever scheduled on that disclosure statement.

10. On June 16, 2015, the Debtor filed the *Debtor's Second Motion to Extend its Exclusive Right to Solicit Plan Acceptances* (the "**Second Motion**" and with the First Motion and Third Motion, the "**Exclusivity Motions**") [DE 167]. In the Second Motion, filed more than two months after the deadline for the Debtor to propose a plan, it indicated that it was "currently formulating substantive amendments to [the plan and disclosure statement] while it continues to search for investors to fund the proposed plan" (Second Motion at 1:19-24).

11. The Second Motion further indicated that the extension would provide the Debtor an opportunity to "*evaluate additional potential restructuring strategies, including potentially receiving financing from new investors and evaluating potential sale opportunities*" (Second Motion at 3, ¶ 13 (italics added)), and aid "the Debtor's ongoing efforts to solicit viable investors to fund the Plan" (*id*. at 4:14-16) (June 2015).

12. On July 7, 2015, the Debtor filed its *First Amended Plan of Reorganization and Debtor Clear Energy Systems, Inc. Dated July 7, 2015* (the "**Plan**") [DE 173] and the Amended Disclosure Statement [DE 174].

13. On July 8, 2015, the Court entered its *Order Granting Debtor's Second Motion to Extend its Exclusive Right to Solicit Plan Acceptances* [DE 180] extending the Debtor's exclusivity period until September 16, 2015.

14. On August 13, 2015, the Court held an initial hearing on approval of the Amended Disclosure Statement. At the hearing, the Debtor requested a 60-day continuance of the Amended Disclosure Statement hearing so it could continue to seek funding for the Plan [DE 201].

15. On September 11, 2015, the Debtor filed the Third Motion. As with the two prior requests, the Debtor indicates that "it continues its search for investors to fund the proposed plan" (Third Motion at 1:23-24), "is marketing the prototype to new investors and refining its plan" (*id.* at 3:11), and needs the time to "*evaluate additional potential restructuring strategies, including potentially receiving financing from new investors and evaluating potential sale opportunities.*" *Id.* at 3, ¶ 12 (September, 2015) (italics added).

16. The Debtor's most recent Business and Industry Monthly Operating Report for the period ended August 31, 2015 [DE 217] (the "**Operating Report**") identifies (a) *no receipts* in the Current Month's Receipts and Expenditures, (b) *no business activity* since the filing in the Income Statement, and (c) *no postpetition liabilities* in the Comparative Balance Statement (Operating Report at 11-13). Yet, each of the Exclusivity Motions describes the Debtor's ability to incur post-petition debt to fund these proceedings. The Amended Disclosure Statement indicates that as of July 7, 2015, the Debtor has received $600,000 of post-petition financing and was in the process of obtaining an additional $200,000. *See* Amended Disclosure Statement at 6:21-24. It should be noted that *no* approval was sought to incur the unsecured credit that was not part of the ordinary course and business affairs of the debtor. *See* § 364(a) and (b). But more importantly, all the Operating Reports are materially false and provide no guidance or useful information to the creditors with respect to their ability to make informed decisions with respect to their rights in this case. The Debtor has incurred, but failed to report hundreds of thousands of dollars in *post-petition* losses.

17. Each of the Exclusivity Motions has listed the Debtor's ability to incur additional unsecured debt post-petition as a reason to grant the extension.[2]

18. As described in the Debtor's disclosure statement, the approach to be taken in the plan of reorganization is to gather information, put the same in a package to disclose to "potential investors" with the hope that the investors will provide financing in the range of $12,000,000 to $18,000,000

---

[2] *See* First Motion at 4, ¶ 12; Second Motion at 2-3, ¶¶ 10-11; Third Motion at 2-3 ¶¶ 9-10.

merely to "take the development of the prototype from its current status through the various stages of finalizing the design, constructing initial beta versions, and completing testing and manufacture of the units for the marketplace." This financing is what is needed to get the gen sets to the point that they can then be marketed and sold.

19. As the disclosure statement goes on to say:

> The timeframe to reach this level spans several years to account for the remaining development, testing and marketing, so there is no immediate return; however, Debtor believes that there is a reasonable likelihood that these sales levels can be achieved and with time, sufficient funds can be recovered by the Debtor to satisfy its creditors in full and return funds to the Shareholders who have participated in the development of this product over the past thirteen (13) years.

[DE 174] (the "**Disclosure Statement**," page 8.)

20. This case has been ongoing for well over a year with no confirmable plan in sight. Instead of filing a viable plan, CES has decided to attempt to prevent other creditors and parties in interest from proposing a plan to pay creditors. Creditors continue to be forced to wait while CES dithers.

21. Despite the claimed need to locate other investors to fund a proposed plan, CES does have a potential source of funds – the funds owed to CES by SARN for the stock interest that SARN received in the company. SARN is an affiliate and insider, both by virtue of the percentage of shares it owns (more than 20%) and through its control of the Debtor. Section 101(2), (31). According to the latest disclosure statement that has been filed, SARN Power and SARN Industrial obtained control of the company after agreeing to infuse $10,000,000 of capital into the company to finish completion of the design and implementation of production. SARN was to pay such cash into the Debtor in regular increments of $1,500,000 each. Three months after SARN took control of the Debtor, and after SARN made one of the payments, SARN unexpectedly shut down the Debtor's operations without letting other shareholders know – devastating the company. The Debtor asserts that it is investigating the conduct of SARN for potential causes of action, but after more than a year of being in this bankruptcy case, the Debtor can provide no greater information on how it plans to pursue SARN for what appears to be an

unfulfilled contractual obligation to contribute funding to the Debtor. If the Debtor is still owed $8,500,000 in funding from SARN, then this obligation should be vigorously pursued. Instead, the plan is to allow SARN to keep its shareholder interest even though it failed to come through with the financing it promised.

22. CES's failure to go after a major source of funds that is owed to it by a major shareholder is simply unconscionable and speaks to collusion between CES management and SARN and an utter unwillingness to hold SARN to its promises and obligations. There can be no good excuse for not having SARN pay the funds into the company that it promised to pay while it continues to hold on to stock that it received, and which it now refuses to pay for. Especially when CES states that SARN's actions have put CES in this position.

23. At this point, CES has not been able to put forth any feasible plan. There is no existing capital structure – other than the funds loaned to the Debtor, most of which will go to the payment of administrative claims. Sales are far off into the future. CES shows absolutely zero interest in going after the $8.5 million owed to it by SARN. The distribution agreement with SARN Power was terminated as part of the resolution with the SARN representatives on the board of directors – and thus, for Europe, there currently is no distribution agreement.

24. At this point, a Trustee should take over to provide independence and competence and to pursue what must be done. CES has utterly and completely failed to put forth any plan that can be confirmed and has shown no progress towards its purported goals. Instead, CES has continued to string creditors along while it continues to incur debt, putting creditors further behind the proverbial 8 ball. TEC has contributed to the development of the generator technology and believes in it. However, TEC has no faith in the current management of CES to continue operations successfully.

**B.     Appointment of a Trustee**.

25. Under the Bankruptcy Code, "at any time after the commencement of the case but before confirmation of a plan, on request of a party in interest . . . and after notice and a hearing, the court shall order the appointment of a trustee - (1) for cause . . .; or (2) if such appointment is in the best interests of

creditors." *See* § 1104(a); *Lowenschuss v. Selnick (In re Lowenschuss)*, 171 F.3d 673, 685 (9th Cir. 1999). Standing alone, either one of these two independent grounds is sufficient to justify granting a motion for the appointment of a Chapter 11 trustee. *Id.*

26. "Cause" includes "fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause …." Section 1104(a)(1). If the Court finds that cause for the appointment of a trustee exists, the Court has no discretion, but must appoint a trustee. *See, e.g.*, *In re G-I Holdings, Inc.,* 385 F.3d 313, 3181 (3rd Cir. 2004); *In re Savino Oil & Heating Co., Inc.,* 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989); *In re Oklahoma Refining Co.*, 838 F.2d 1133, 1136 (10th Cir. 1988). The court need not find any of the enumerated wrongs in the statute to find cause to appoint a trustee. *Id.* (citations omitted).

27. A Trustee may be appointed for cause where there is an inability of a debtor's management to function effectively due to lack of creditor confidence and conflict within the debtor. Cf. *In re Microwave Products of America, Inc.*, 102 Bankr. 666 (Bankr. W.D. Tenn. 1989); *In re Sharon Steel Corp.*, 86 Bankr. 455, 460 (Bankr. W.D. Pa. 1988), *aff'd*, 871 F.2d 1217 (3d Cir. 1989); and *In re Ionosphere Clubs, Inc. (Eastern Airlines)*, 113 Bankr. l64 (Bankr. S.D.N.Y. 1990). *See also In re Products Intern. Co.,* 395 B.R. 101, 110-111 (Bankr. D. Ariz. 2008) (lack of focused management team based on acrimonious relations between owners found to be gross mismanagement and "cause" to appoint trustee under § 1112(b)(4)(B)). *See also In re Colorado-UTE Electric Ass'n*, 120 B.R. 164 (Bankr. D. Colo. 1990) (finding cause to appoint a trustee where there was significant conflict between debtor and board of directors and that board and management were incompetent to reorganize debtor).

28. As to whether the appointment of a trustee is in the best interest of creditors pursuant to § 1104(a)(2), the court should "eschew rigid absolutes and look to the practical realities and necessities." *Eastern Airlines*, at 168 (citation omitted). The court should also consider the following four factors:

    (i)    the trustworthiness of the debtor;

///

(ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation;

(iii) the confidence -- or lack thereof -- of the business community and of creditors in present management; and

(iv) the benefits derived by the appointment of a trustee, balanced against the costs of appointment.

*Id.* (citations omitted). *See also In re L.S. Good & Co.*, 8 B.R. 312 (Bankr. D. W. Va. 1980) (trustee appointed where continuation of current management resulted in conflicts in interest, prospects for successful rehabilitation were remote, and there was likelihood of liquidation); *In re Hotel Associates, Inc.*, 3 B.R. 343 (Bankr. E.D. Pa. 1980) (trustee appointed where there was a greater likelihood that impartial trustee would bring more objectivity and impartiality to attempt to rehabilitate debtor and trustee would be able to better supervise operations).

29. In this case, SARN is a major stockholder in the business. The SARN representative board members were purportedly ousted, but nothing is being done to pursue SARN to seek to have it perform on the funding obligations that it committed to. The plans proposed by the Debtor thus far permit SARN to keep its stock interest in the company without having to perform on the funding obligations which formed the basis for granting them the stock interest in the first place.

30. Again, the Plan most recently proposed by CES is based on finding funding from an investor – but nothing is being done to get the funds from SARN that it promised, nor are any funds or litigation being commenced to hold SARN's feet to the proverbial fire. Why CES has not gone after SARN to pay the rest of the funds it owes to the company for its stock interest it acquired is beyond comprehension.

31. Furthermore, CES's plan is to find funding from a white-knight investor to help fund the continuation of the business through testing and sales of the generator units. Despite having the better part of a year to find someone to invest in CES, there has been absolutely no progress on this front whatsoever, and it is very difficult to fathom how CES plans to successfully rehabilitate.

32. Without the funding, CES cannot get to the point of testing and validating the prototype generator – the backbone of its business. Furthermore, by CES's own admission, they will not be able to even begin selling prototypes for several years. There simply are no real prospects for rehabilitation at this point without active and aggressive management. The only thing that management has been able to do is begin to put together glossy printed materials to send out to potential investors that they looked up on the internet. What strategy is this?

33. Also, as noted previously, CES continues to incur hundreds of thousands of dollars in additional post-petition unsecured debt from equity holders and proposes to pay those creditors ahead of other creditors – all without seeking any approval of the same. Although § 364(a) authorizes a debtor-in-possession to incur unsecured debt in the ordinary course of business, borrowing $1 million is not an ordinary course of business transaction. *In re Husting Land & Devel., Inc.,* 255 B.R. 772, 782. (Bankr. Utah 2000). As in *Husting Land:* (a) the borrowing is the most significant event that has occurred in this case; (b) the monies are required to find substitute performance for what SARN previously contracted to do; (c) the nature of the financings appear to be open-ended and the amount is not unknown; and (d) the estate is without a source to repay the post-petition financings. *Id.* However, unlike this case, there is no suggestion in *Husting Land* that the debtor in that case concealed the transactions by failing to report them on its monthly operating reports. The actions of CES more than aptly demonstrate that it is not capable of performing its duties as debtor-in-possession and that a trustee is necessary.

34. From the foregoing, it is clear that an independent trustee is necessary to properly evaluate the prospects for the rehabilitation of the Debtor, to provide independent judgment where there is a huge conflict between the company and SARN, its major shareholder – the shareholder that pushed the company into bankruptcy, and to pursue any necessary litigation against SARN. A viable plan should include going after SARN and using the funds from that litigation to fund the plan. If funds are needed, CES can start by getting the funds owed to it from SARN.

///

35. TEC requests the appointment of a trustee for cause, and also for the reason that appointment of a trustee is in the best interests of creditors. CES management has shown that it is incapable of acting in the best interests of the Debtor and its creditors.

**C.    Conversion of the Case.**

36. If the Court finds that the appointment of a trustee under § 1104 is not appropriate, then, alternatively, TEC requests that this Court convert the case to one under Chapter 7 of the Bankruptcy Code pursuant to § 1112(b)(1).

37. "Under § 1112(b)(2), the bankruptcy court may dismiss or convert a Chapter 11 case if the debtor is unable to effectuate a plan, which means that the debtor lacks the ability to formulate a plan or to carry one out." *In re Greenfield Drive Storage Park, LP,* 207 B.R. 913, 917 (B.A.P. 9th Cir. 1997) (no abuse of discretion found after case was converted to Chapter 7 post-confirmation when sole source of debtor's income was repossessed and issues concerning liability of partners had not been unresolved). *See also Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir. 1989); *Koerner v. Colonial Bank (In re Koerner)*, 800 F.2d 1358, 1368 (5th Cir.1985) (finding conversion warranted after sixteen months where proposed plan was nebulous, infeasible and inadequate); *Fossum v. Federal Land Bank (In re Fossum)*, 764 F.2d 520 (8th Cir.1985); *In re Ray*, 46 B.R. 424 (S.D. Ga.1984) (finding conversion warranted where debtor failed to propose confirmable plan in approximately one year); cf. *Fishell v. United States Trustee*, 1994 U.S. App. LEXIS 3875 (6th Cir.1994) (finding conversion warranted for failure to effectuate plan where debtors failed to propose confirmable plan in fourteen months and also noting that the case could be dismissed for delay prejudicial to creditors).

38. The Debtor's Second Amended Schedule F – Creditors Holding Unsecured Priority Claims [DE 197] lists unsecured debt of $4,422.145.44.[3] Yet, since the filing, the Debtor has incurred approximately an additional $1,000,000, but has accomplished nothing. The facts more than aptly demonstrate a substantial and continuing loss and diminution of the estate without a reasonable

---

[3] Note that at $5,000,000 of fixed, liquidated, unsecured debt, the appointment of a trustee is mandatory upon the request of a party in interest. Section 1104(c)(2).

likelihood of rehabilitation, which constitutes "cause" to convert this case to Chapter 7. Section 1112(b)(1), (4)(A).

39. If the Court finds that the appointment of a trustee would be fruitless and no viable plan could be put forth, then alternatively TEC argues that cause exists to convert this case to one under Chapter 7.

**D.  Conclusion**.

For all the reasons stated above, CES has not been able to put forth a confirmable plan – and no viable plan appears to be forthcoming. CES shows no interest in going after its affiliate and insider SARN for the money that is owed by SARN for the purchase of its stock interest and its commitment to provide funding. Meanwhile, the Debtor has expended something close to a $1,000,000 post-petition while making no discernable progress to a resolution. A trustee appointed under either Chapter 11 or Chapter 7 could appraise and sell the intellectual property which may fetch an investor, and the trustee could also pursue the cause of action against SARN which would also provide a substantial recovery for creditors. The Court and creditors have given this Debtor sufficient latitude and patience. The time to put an end to the Debtor's unreported dissipation of estate assets has come. A trustee needs to be appointed to administer this estate.

DATED this __27th__ day of October, 2015.

                                      SCHIAN WALKER, P.L.C.

                                      By __/s/   DALE C. SCHIAN, #010445__
                                          Dale C. Schian
                                          Attorneys for TEC International LLC

COPY of the foregoing e-mailed
this __27th__ day of October, 2015, to:

Shelton L. Freeman, Esq.
Freeman Huber Law, PLLC
6909 East Main Street
Scottsdale, Arizona 85251-4311
Attorneys for Debtor
tony@fhlawaz.com

| | |
|---|---|
| 1 | Patty Chan, Esq.<br>U.S. Trustee's Office |
| 2 | 230 North First Avenue, #204<br>Phoenix, Arizona 85003-1706 |
| 3 | patty.chan@usdoj.gov |
| 4 | |
| 5 |   /s/    DEBBI STEPHENS |